UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

**KELLY D. DELAPP,**

       **Plaintiff,**

**v.**                                              **CIVIL ACTION 2:14-cv-17051**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

## M E M O R A N D U M   O P I N I O N

    Pending before this Court is Plaintiff's Motion for Summary Judgment (ECF No. 15) and Brief in Support of Defendant's Decision (ECF No. 17). This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income under Title XVI of the Social Security Act. Both parties have consented to a decision by the United States Magistrate Judge.

Background

    On April 6, 2011, Kelly D. Delapp, (Claimant), applied for Social Security Benefits Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging disability beginning on January 11, 2008. June 22, 2011, the claims for SSI and DIB were denied initially and again upon reconsideration on October 12, 2011. Claimant filed a written request for hearing on November 7, 2011. Claimant appeared in person and testified at a hearing held in Parkersburg, West Virginia on December 4, 2012. In the Decision dated December 20, 2012, the ALJ determined that based on the application for a period of disability and disability insurance benefits, Claimant was not disabled under sections 216(i) and 223 (d) of the Social Security Act and based

on the application for supplemental security income, Claimant was not disabled under section 1614(a)(3)(A) of the Social Security Act. On January 14, 2013, Claimant filed a Request for Review of Hearing Decision of the ALJ. On April 1, 2014, the Appeals Council denied Claimant's request for review and "found no reason under our rules to review the Administrative Law Judge's decision" (Tr. at 1). The Appeals Council stated:

> In looking at your case, we considered the reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council.
>
> We considered the Occupational Disability Assessment dated March 26, 2010, and the Deposition of Scott James Feathers, D.P.M., dated June 7, 2010 (65 pages). These documents are not new because they are exact copies of Exhibits 1F and 23F.
>
> We found that this information does not provide a basis for changing the Administrative Law Judge's decision.
>
> With your request for review, you alleged that "the ALJ prohibited claimant's counsel to ask specific questions to the vocation expert at the hearing about Mr. Woolwine's report, which was highly prejudicial." We considered your allegations solely as they relate to your case under the abuse of discretion standard in 20 CFR 404.970 and 416.1470. After reviewing the entire record, including the hearing recording, we have determined that there was no abuse of discretion and that no other basis exists to grant review in this case. We have completed our action on your request for review. (Tr. at 1-2).

On May 28, 2014, Claimant bought the present action requesting this Court to review the decision of the defendant and reverse or remand the decision.

### Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."

2

42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2014). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2014). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity during the period of time from his alleged onset date of January 11, 2008, through his date last insured (DLI) of March 31, 2010 (Tr. at 23). Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic

3

lumbar strain with back and possible L5-S1 radiculopathy, sciatica on the right, posttraumatic migraine headaches, history of plantar fasciitis and partial Achilles tendon tear of the right foot, and obesity. (*Id.*) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1 (Tr. at 27). The ALJ then found that Claimant has a residual functional capacity for light work. (*Id.*) Claimant can stand/walk a total of four hours in an eight-hour workday. She can occasionally balance, stoop, kneel, crouch and climb ramps and stairs, can never crawl, or climb ladders, ropes or scaffolds, may have frequent exposure to extreme could and heat, frequent exposure to vibrations, and frequent exposure to hazardous conditions. Claimant is able to perform simple routine tasks and have occasional interaction with the general public and co-workers. The ALJ held that Claimant was unable to perform any past relevant work as a deli stock clerk, counter worker, cashier/assistant sales manager, photographer and hotel clerk (Tr. at 35). However, the ALJ found that Claimant's "ability to perform all or substantially all of the requirements of this level has been impeded by additional limitations." Nevertheless, the ALJ concluded that Claimant could perform jobs at the sedentary level, such as document preparer, food sorter and folder (Tr. at 36). As such, the ALJ found that Claimant has not been under a disability as defined in the Social Security Act (Tr. at 38).

## Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial

evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

### Claimant's Background

Claimant was born on February 21, 1966, and was 41 years old on the alleged disability onset date. Claimant graduated from high school and received training as a medical assistant (Tr. at 60). Although Plaintiff stopped working on January 20, 2005, to take care of her disabled spouse and mother, she alleges disability as of January 11, 2008, when she was in a car accident (Tr. at 61).

### The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

### Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ failed to grant "great weight" to the opinions of her treating physicians (ECF No. 16). Additionally, Claimant argues that the ALJ incorrectly gave no weight to D. Joe Woolwine, Occupational Disability and Rehabilitation Consultant. Additionally, Claimant asserts that the ALJ improperly prohibited Claimant's counsel to ask the vocational expert (VE) at the hearing about Mr. Woolwine's report. Defendant asserts that Claimant "fails to

5

recognize that the consultant did not render an opinion based upon the standards of a social security disability claim, but instead based upon her projected loss of earnings over her lifetime" (ECF No. 17). Defendant asserts that the VE who testified in this case in response to a hypothetical question contradicts Claimant's assertion of being "permanently and totally occupationally disabled." (*Id.*)

Medical Opinions

On May 21, 2008, I. Derakhshan, M.D., a psychiatrist and neurologist, examined Claimant at the request of an attorney (Tr. at 375). Claimant reported low back pain radiating to her left leg in a distribution of meralgia paresthetica, as well as occasional headaches, neck pain, and nocturnal numbness of the upper extremities with dropping of objects. (*Id.*) A neurological examination revealed a normal mental state with good insight and normal memory function. An examination of the cranial nerves was normal. A motor examination revealed normal motor power, tone, bulk, and posture in all extremities with reflexes preserved. Testing of Claimant's sensation, coordination, and gait were unremarkable, except for a weak grip bilaterally. Dr. Derakhshan suspected that "this patient's major problem is weight and I am asking her to observe a strict diet" (Tr. at 375-376). He prescribed Topamax, Tofranil PM, and Norco for symptom relief (Tr. at 376).

Claimant returned to Dr. Derakhshan in 2009 reporting that she still had low back pain radiating into her legs (Tr. at 382-383). Dr. Derakhshan indicated that medication helped to reduce the pain, prescribed Topamax and Vicodin, and advised her to return in 6 months. (*Id.*) In July 2008, Claimant sought treatment with Scott J. Feathers, D.P.M., a podiatrist, for complaints of pain in her entire left foot and in the posterior right heel and Achilles region of the right foot (Tr. at 439). A physical examination revealed no vascular, dermatological, or orthopedic abnormalities. She was sensitive to sharp and dull sensation in all areas of both feet. Dr. Feathers stated that he was "unsure of [Claimant's] symptoms in her left foot," but it appeared that, by

6

palpating the posterior right heel and Achilles tendon region, there was mild swelling and noticeable tenderness. Consequently, he recommended an Ice Therapy system with a pump and advised her to return for follow up. (Id.) At a follow-up visit later that month, Claimant had diminished edema of her left foot, even though she complained that it was unchanged (Tr. at 439, 513). Dr. Feathers applied orthopedic strapping to both feet and advised her to return for follow-up. When Claimant returned the following month, in August 2008, Dr. Feathers' assessment was plantar fasciitis, secondary to trauma from a car accident, and a partial tear of the Achilles tendon that was healing, but was still painful (Tr. at 440). Consequently, Dr. Feathers administered a steroid injection to the left heel, as well as orthopedic strapping, and advised Claimant to use an Ace bandage on her right foot and back of her heel. He also recommended that Claimant continue to use ice therapy and elevation. At Claimant's next follow-up visit in September 2008, she reported similar complaints, but admitted that her condition had improved with less pain in the bottom of the left foot (Tr. at 440, 516-517). A physical examination revealed that Claimant's edema was visibly reduced (Tr. at 440). Consequently, Dr. Feathers noted that Claimant had improvement with the left ankle and foot and he casted her for orthotics (Tr. 440). At Claimant's next and last follow-up visit in September 2008, she was fitted for orthotics, which "fe[lt] better" (Tr. at 440, 517).

In April 2009, Robert Akers, a chiropractor, provided correspondence, but not his records, indicating that he had treated Claimant for an injury to her lumbar spine and left SI joint (Tr. at 492). He stated that Claimant's initial examination revealed a decreased motion of the lumbar spine, tenderness of the L4-5 vertebra and left SI joint with muscle spasm. Chiropractor Akers treated Claimant with chiropractic manipulation, EMS, heat, and prescribed home exercises. He indicated that her treatment plateaued and released her from active care with home exercises. Chiropractor Akers opined that Claimant reached maximum medical improvement (MMI) and her

injuries were related to her automobile accident on January 11, 2008.

In August 2009, James H. Rutherford, M.D., an orthopedic surgeon, performed an independent orthopedic evaluation in connection with Claimant's accident (Tr. at 352-355). A physical examination revealed that Claimant was 5 feet, 5 inches tall and weighed 244 pounds (Tr. at 353). Dr. Rutherford noted that Claimant had a satisfactory gait and was able to stand on her heels and toes, as well as perform a tandem gait (Tr. at 354). She was able to perform 50% of a deep knee bend. Claimant was able to flex her lumbar spine to 45 degrees (60 degrees being normal). Claimant had 20 degrees of lateral flexion to the right and 10 degrees to the left. Claimant's deep tendon reflexes were 1+ at each knee and ankle. (*Id.*) Her motor function in the lower extremities was intact. She had a small reddened area on the medial aspect of her right heel, which had been present since the time of her injury. Although there was 5 degrees of dorsiflexion of the right ankle and some tenderness of the right Achilles tendon, there was satisfactory plantar flexion, inversion, and eversion. There was also some mild tenderness in the area of the arch of the left foot with a full range of motion of the left ankle. Straight leg-raising tests were negative to 80 degrees on the right and 70 degrees on the left. Claimant was also able to place her left leg in a figure-eight position with her left foot on top of her right knee. An examination of the neck revealed a full range of motion with no point tenderness. An examination of the right shoulder revealed 140 degrees of flexion, and 150 degrees of abduction, as well as 70 degrees of internal rotation, and 80 degrees of external rotation. Claimant's grip strength was 60 pounds on the left and 25 pounds on the right. Her sensation was intact. Dr. Rutherford opined that Claimant sustained a lumbosacral sprain/strain, a strain of her left Achilles tendon, and a sprain/strain of her right shoulder in the accident (Tr. at 355). Dr. Rutherford opined that Claimant had a 13% permanent partial impairment of the whole person, but he expressed no opinion as to her

psychological conditions (Tr. at 354). He also opined that Claimant was limited to sedentary-type work activities, including intermittent standing and walking up to 4 hours in an 8-hour day, but could lift up to 10 pounds occasionally (Tr. at 355). He opined that she could drive to work, but should not perform any stooping or crouching for work activity.

On October 7, 2009, Dr. Derakhshan provided a statement at the request of Claimant's attorney indicating that Claimant had continued physical problems following her motor vehicle accident including low back pain, neck pain and frequent headaches (Tr. at 390). He opined that her prognosis was guarded. He also indicated that she had limitations on repetitive movements, carrying, lifting, pushing, pulling, climbing, squatting, and forward bending. Finally, he recommended pharmacology and stated that conservative treatment would be needed for her low back pain, neck pain, and headaches (Tr. at 391).

On March 26, 2010, William Given, M.A., examined Claimant at the request of a vocational consultant, D. Joe Woolwine, who examined Claimant at the request of her attorney for her civil lawsuit (Tr. at 323-340, 356-363). Claimant was cooperative and personable (Tr. at 356). Intelligence testing revealed that Claimant had a full scale IQ in the low-average to average range (Tr. at 358). Psychologist Given opined that Claimant's score may not be an accurate assessment of Claimant's overall abilities because of the significant difference between the verbal IQ (10the percentile), and the performance IQ (45th percentile) (Tr. at 357). Other testing suggested learning deficits in reading, and possibly mathematics, when these scores were compared to her strongest cognitive activities (Tr. at 358). Nevertheless, Psychologist Given stated that Claimant could learn new job skills through on-the-job training because of her ability to follow oral instructions and demonstrations.

D. Joe Woolwine, M.S., C.R.C., performed an occupational disability assessment in March 2010, presumably for the lawsuit related to Claimant's automobile accident (Tr. at 323-340). Mr. Woolwine opined that Claimant was "permanently and totally occupationally disabled" with a projected worklife loss of $218,808.00 and a projected lifetime loss of the ability to perform household chores in the amount of $239,117.00 (Tr. at 333). He indicated that Claimant "d[id] not appear to be an appropriate candidate for rehabilitation."

When Claimant returned to Dr. Derakhshan on September 17, 2010, she reported that she still had headaches and low back pain radiating to both legs, but medication helped to relieve the pain (Tr. at 384). Dr. Derakhshan documented no examination findings whatsoever other than Claimant's weight and blood pressure, but prescribed Adipex (an appetite suppressant), Zomig for headaches, and Vicodin for pain (Tr. at 315, 384).

In June 2011, John J. Kampsnider, Ph.D., a licensed psychologist, examined Claimant (Tr. at 398-401). Notably, Claimant drove herself 25 miles to the interview. Claimant indicated that she applied for disability benefits due to physical problems since her accident, but when questioned why she was sent to see a psychologist, she stated that she has "major depression" ever since the accident (Tr. at 399). Specifically, she stated that she had a depressed mood daily, sleep disturbance, reduced interests, reduced libido, low self-esteem, impaired concentration, and a pessimistic view of the future. Claimant denied any mental health treatment. Claimant indicated that her daily activities include getting up at 11 a.m., eating a lunch that she prepared, performing light chores in the afternoon ("pain permitting"), such as dishes and light cleaning (Tr. at 400). She and her husband prepare supper together and then spend evenings watching television. She regularly visited her parents, who live close by, and travels to town approximately twice per month. A mental status examination revealed that Claimant's speech was normal tone,

rapid in pace, and appropriate for content. Her affect was somewhat constricted. Her observed mood was dysthymic with occasional tearfulness. She denied any suicidal or homicidal ideation. Her thought process was organized, relevant, and logically connected. There was no evidence of abnormal thought patterns, and she denied any hallucinations or delusions. Dr. Kampsnider noted that Claimant's abstract thought was intact with an estimated IQ in the average range. Claimant's insight and judgment were within normal limits. Her functional abilities/concentration were within normal limits based upon spelling the word "world" backwards and calculating serial threes backwards. Her immediate memory was within normal limits as evidenced by her ability to repeat four out of four words, as well as her remote memory based upon her ability to recall personal historical data (Tr. at 400-401). However, her recent memory was moderately impaired based upon her ability to recall only two out of four words after a 30-minute delay (Tr. at 401). Her social functioning was within normal limits based upon clinical observation of her interactions during the interview. Claimant's persistence was within normal limits, but her pace was moderately impaired due to her hesitant pattern of response while calculating serial threes. Dr. Kampsnider's impressions were major depressive disorder, moderate, without psychotic features, and dysthymic disorder.

On June 14, 2011, Stephen Nutter, M.D., examined Claimant (Tr. at 418-423). At that time, she reported back pain, joint pain, and headaches (Tr. at 418). Dr. Nutter's physical examination revealed a normal blood pressure (120/76) (Tr. at 419). Claimant walked with a mildly limping gait, but did not require an assistive device, and was stable at station. She appeared comfortable sitting, but not in the supine position. Her intellectual functioning appeared normal. Her recent and remote memory for medical events was good, but history taking was difficult. An examination of the upper extremities revealed evidence of pain with movement of the right

shoulder (90 degrees of forward flexion, but denied being able to perform internal/external rotation or abduction) and wrist, but there was no evidence of redness, warmth, swelling, tenderness, crepitus, or laxity in the rest of the upper extremity joints (Tr. at 420). Claimant was able to make a fist bilaterally and there was no atrophy in the hands. Dr. Nutter noted that Claimant gave submaximal voluntary effort when asked to squeeze his fingers. However, his best estimate of her grip would be 3.5 on the right and 5 on the left when squeezing his fingers. Claimant was able to write and pick up coins with either hand without difficulty.

An examination of the lower extremities revealed that the right Achilles was very tender. Claimant also reported a reduced range of knee motion due to subjective complaints of back pain (Tr. at 420). There was no pain with range of motion testing of the cervical spine and no paravertebral muscle spasm. Although there was back pain with range of motion testing of the lumbar spine, there was no evidence of paravertebral muscle spasm and straight leg-raising tests were negative (Tr. at 420-421). Claimant's sensation to touch, pinprick and vibratory sense were normal except for a loss of pinprick to the lateral right foot and leg (Tr. at 421). There was difficulty eliciting reflexes during testing due to Claimant's inability to relax, but there were no pathological reflexes or atrophy. Claimant denied being able to walk on her heels or toes, perform a tandem gait, or perform a squat. Although there was diminished strength noted in all muscle groups tested, Dr. Nutter noted that there was submaximal voluntary effort and give-way weakness noted with strength testing. Dr. Nutter's impression was chronic lumbar strain, headache, and arthralgia. While he noted that Claimant had range of motion abnormalities of the cervical and lumbar spine, sensory abnormalities, reflex abnormalities, and muscle weakness, these findings were not consistent with nerve root compression. Although Claimant also complained of headaches, Dr. Nutter noted that Claimant's neurological examination was normal

and there were no focal deficits. (Id.) Similarly, Claimant reported joint pain and tenderness, but the physical examination revealed no synovial thickening, periarticular swelling, nodules, or contractures (Tr. at 422).

Based upon a review of the medical evidence of record on June 21, 2011, Fulvio Franyutti, M.D., opined that Claimant could perform the exertional requirements of light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking about 6 hours in an 8-hour work day, and sitting about 6 hours in an 8-hour work day) (Tr. at 424-425). Dr. Franyutti opined that Claimant could perform all postural movements occasionally, except could never climb ladders, ropes, or scaffolds, and never crawl (Tr. at 426). He also recommended that Claimant avoid concentrated exposure to some environmental irritants (Tr. at 428). Based upon a review of the medical evidence in October 2011, A. Rafael Gomez, M.D., affirmed the opinion of Dr. Franyutti as written (Tr. at 435).

Claimant returned to Dr. Derakhshan on September 2, 2011 stating that she was still having headaches and lower back pain due to her motor vehicle accident, but that medication helped to relieve her pain (Tr. at 446-447). He documented no examination findings other than Claimant's weight and blood pressure, continued her medications, and advised her to return in 6 months (Tr. at 446).

Based upon a review of the medical evidence of record on October 7, 2011, James W. Bartee, Ph.D., a state agency psychologist, opined that Claimant did not have a severe mental impairment (Tr. at 433). In support of his opinion, Dr. Bartee noted that Claimant alleged no new conditions and there was no documentation of any worsening signs or symptoms. Therefore, he indicated that he concurred with the opinion of Bob Marinelli, Ed.D., who previously opined on June 14, 2011, that Claimant had no severe mental impairment (Tr. at 403-17, 433).

Claimant initially sought treatment at the West Virginia Health Right Clinic on May 25, 2012, for complaints of a hernia (Tr. at 443). At that time, Vicki Spurlock, F.N.P, a family nurse practitioner, diagnosed morbid obesity, elevated blood pressure, and an umbilical hernia, but no other abnormalities were documented on examination (Tr. at 443). Because Claimant's appetite suppressant medication (Adipex) could cause an elevated blood pressure, she advised her to return in 4 weeks.

When Claimant returned to Dr. Derakhshan on July 27, 2012, she reported that she was still having headaches and low back pain radiating into both legs, but medication helped to relieve her symptoms (Tr. at 449). Dr. Derakhshan documented no examination findings other than Claimant's weight and blood pressure. Nevertheless, he renewed her medications and advised her to return in 7 months. Notably, at that time, he also prescribed Adderall without any explanation or elaboration (Tr. at 451), which he subsequently renewed approximately monthly on three occasions (Tr. at 452, 454, 455).

On October 8, 2012, Bryan Kelly Richmond, M.D., performed an umbilical hernia repair (Tr. at 459-463). Claimant returned to the emergency room later that day stating that she was unable to urinate (Tr. at 468). She was treated for acute urinary retention post anesthesia, released that same day, and advised to follow-up in 2 or 3 days (Tr. at 468-475). When she returned to CAMC two days later, she was advised to keep the Foley catheter for 1 week (Tr. 484-485). Approximately 2 weeks later, Claimant returned to CAMC with some mild drainage from her incision site, but she denied any bladder incontinence (Tr. at 486). She no longer had swelling at the incision site and she was advised to return for follow-up. When Claimant returned her incision site was cleaned and an antibiotic was prescribed for 1 week (Tr. at 488). Although she complained of increased pain at her next follow-up visit, her incision site "look[ed] good," so she was advised

to continue dressing changes and return in 1 month (Tr. at 490).

### Vocational Expert

At the hearing, Vocational Expert (VE) Patricia Posey testified that she had reviewed "the file and exhibits to familiarize [herself] with the claimant's vocational background" and heard Claimant's testimony (Tr. at 96). The VE stated that she is familiar with the Social Security Act's regulatory definitions of unskilled, semi-skilled, skilled, sedentary, light, medium, heavy and very heavy work. She reported to also being familiar with jobs that exist in the local, regional and national economy.

The ALJ instructed the VE to assume a hypothetical individual of Claimant's age, education and the past work experience. The VE was directed to assume the individual is limited to light work, can occasionally balance, stoop, kneel, crouch and climb ramps and stairs, never crawl and never climb ladders, ropes or scaffolds, may have frequent exposure to extreme heat and cold, frequent exposure to vibrations and frequent exposure to hazardous conditions. The ALJ asked the VE if the hypothetical individual could perform any of Claimant's prior jobs? The VE testified that she believed "such an individual could work as the cashier at either the skilled level or the semi-skilled –unskilled level" and that she believe the individual could work as a laundry clerk. The VE believed the individual could work as a photographer. The VE testified that "These are light occupations and would meet your limitations in terms of posture" (Tr. at 99). The VE testified that "even though the DOT [Dictionary of Occupational Titles] indicates that individuals who work in the laundry as a reception clerk – [a] receiving clerk may lift more than 20 pounds, I believe that such things could be limited to light." (*Id.*)

The ALJ then asked the VE to name other jobs based on the hypothetical of limiting an individual working as a laundry clerk to light exertion. The VE testified that such an individual

could perform work as a garment bagger, cleaner and mail clerk (Tr. at 100). The VE stated that "These are all light, unskilled—yes, all light unskilled occupations." (*Id.*) The ALJ asked the VE if her answer would change if the hypothetical individual is limited to simple routine tasks. The VE testified that it does not change because the jobs previously stated are not skilled. The ALJ asked the VE if the individual could perform Claimant's past work. The VE testified that "[T]he individual could not perform those jobs that I mentioned that were either semi-skilled, or skilled," therefore the individual could not do photography work, could not work as a cashier 1 and could not work as a front desk clerk (Tr. at 100-101).

The ALJ then added to the last hypothetical that the individual is limited to a total of four hours of standing and walking in an eight hour work day and asked the VE if that would change her answer (Tr. at 102). The VE testified that "It would be my opinion that there would no longer be a light occupation and I don't think the individual could carry out the light work activities." (*Id.*) The ALJ asked the VE if she could name any sedentary jobs Claimant could perform. The VE testified that she believed such an individual could work as a document preparer, food sorter and folder. The VE stated that "These are all sedentary, unskilled occupations." The ALJ asked the VE if he were to "add to the last hypothetical that the individual can have occasional interaction with the general public and occasional interaction with co-workers," would that change the VE's previous answer. The VE testified that "It is my opinion it would not exchange – would not change the hypothetical," therefore, the individual could perform the positions of document preparer, food sorter and folder (Tr. at 103).

Claimant's counsel asked the VE if she reviewed the report from Mr. Woolwine when reviewing Claimant's file in preparation for the hearing (Tr. at 103). The VE testified no, that she does not have access to any of those records. Claimant stated on the record that she was using

Mr. Woolwine to provide a vocational assessment, however, he died prior to the hearing. As such, Claimant argues that she is relying on Mr. Woolwine's report as a vocational assessment (Tr. at 105). Claimant argues that Mr. Woolwine's report is relevant and should have been reviewed by the VE. The ALJ stated on the record that he did not see the relevance of the VE's opinion on Mr. Woolwine's report (Tr. at 106).

## Discussion

In order for a vocational expert's opinion to be relevant or helpful, it must be based upon consideration of all other evidence in the record. *Chester v. Mathews*, 403 F.Supp. 110 (D.Md. 1975). The Fourth Circuit has held:

> [I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities—presumably, he must study the evidence of record to reach the necessary level of familiarity. In addition, the opinion of a vocational expert must be based on more than just the claimant's testimony—it should be based on the claimant's condition as gleaned from the entire record. *Walker v. R. Bowen*, 889 F.2d 47 (4th Circuit 1989).

In the present matter, the VE testified that she had not reviewed Mr. Woolwine's report. Mr. Woolwine's report consisted of an Occupational Disability Assessment of Claimant "to address the vocational implications of impairment" (ECF No. 16) Furthermore, the VE testified that she only reviewed the exhibits relating to Claimant's work history and Claimant's application (Tr. at 103).

The "Purpose of vocational expert testimony is to determine whether a job exists for someone with the precise impairments that the claimant has." *Jones v. Sullivan*, 804 F. Supp. 1398 (D. Kan. 1992). The VE clearly did not consider all evidence of record, therefore, this Court finds that the ALJ's decision is not supported by substantial evidence.

<u>Conclusion</u>

Based on the above, this Court concludes that this matter be remanded for further administrative proceedings with this memorandum opinion. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment (ECF No. 15), is **GRANTED**, Brief in Support of Defendant's Decision (ECF No. 17) is **DENIED**, this matter is **REVERSED** and **REMANDED** for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to provide copies of this ORDER to all counsel of record.

ENTER: September 22, 2015.

_____
Dwane L. Tinsley
United States Magistrate Judge